UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| PLANNED PARENTHOOD ASSOCIATION OF UTAH,<br><br>Plaintiff,<br><br>vs.<br><br>GARY R. HERBERT, in his official capacity as Governor of the State of Utah, and JOSEPH K. MINER, M.D., in his official capacity as Executive Director of the Utah Department of Health,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER DENYING PRELIMINARY INJUNCTION**<br><br>Case No. 2:15-cv-693<br><br>Judge Clark Waddoups |

## **INTRODUCTION**

This matter is before the court on a motion for preliminary injunction filed by Planned Parenthood Association of Utah ("Plaintiff"). Under the direction of Governor Gary R. Herbert, the Utah Department of Health notified Plaintiff that it was terminating or not renewing four contracts due to allegations of misconduct by other Planned Parenthood entities. On September 29, 2015, the court entered a temporary restraining order ("TRO") that precluded the defendants from defunding or denying funding to Plaintiff based on the allegations of misconduct.

1

Following the court's issuance of the TRO, the State announced publically that it would continue to fund the contracts through December 31, 2015, to allow time for this motion to be addressed.

On October 15, 2015, the court held an evidentiary hearing to determine if a preliminary injunction should issue. In light of the State's plan to continue with the contracts through year-end, the defendants did not object to the TRO remaining in place pending the court issuing this decision. Hearing Tr., at 75-76 (Oct. 15, 2015) (Dkt. No. 27). After due consideration of the parties' briefing, oral arguments, and evidence, the court concludes Plaintiff has failed to meet its burden for a preliminary injunction. Accordingly, the court denies the motion and vacates the TRO.

**BACKGROUND**

Planned Parenthood Federation of America, Inc. is a national corporation that has independent local affiliates ("Planned Parenthood"). Plaintiff is one of those affiliates. In July 2015, The Center for Medical Progress began releasing secretly recorded videos of Planned Parenthood officials discussing abortions and fetal tissue. According to public reports, the videos portray Planned Parenthood altering how abortions are performed to obtain more intact fetal tissue and organs. They also portray Planned Parenthood selling fetal tissue.[1] Such conduct is illegal under federal law. Planned Parenthood asserts the videos have been highly edited to convey false information and that it has abided by all state and federal laws. Nevertheless, the videos have sparked nationwide media coverage and protests.

---

[1] The videos were not offered into evidence and the court makes no finding about whether the public reports are accurate or whether the videos accurately portray the conduct as alleged. The parties submitted affidavits in support of their respective positions and the defendants agreed to accept the allegations in paragraphs 12 through 22 of the Complaint as true for purposes of this motion. Mem. in Opp'n, at ix (Dkt. No. 19). The parties did not offer any additional evidence at the preliminary hearing.

Unlike other Planned Parenthood organizations, Plaintiff has never "participate[d] in any programs that allow its patients to donate fetal tissue after an abortion." Declaration of Karrie Galloway, ¶ 13 (Dkt. No. 3-1) (hereafter "Galloway Decl."). Thus, there is not even an allegation that Plaintiff has engaged in any wrong doing. Instead, Plaintiff has had a long-term relationship with the Utah Department of Health (the "Department") as a provider of health care, STD testing, and education. Throughout that relationship, Plaintiff has enjoyed an excellent reputation with the Department.

Plaintiff's services are available to all who seek them, including the underinsured and uninsured. It has worked to develop a relationship with "groups that are at higher risk for contracting and spreading disease, and having unplanned pregnancies." *Id.* ¶ 6. Plaintiff seeks to provide education and testing to such groups to reduce the number of unplanned pregnancies and stop the spread of communicable diseases. The contracts at issue in this suit reflect the unique position that Planned Parenthood holds in the community. Two of the contracts are "for after-school abstinence education programs." Mem. in Opp'n, at x (Dkt. No. 19). Another contract is for an STD surveillance network that "track[s] the reporting of sexually transmitted diseases." *Id.* The final one is a "letter of understanding in which Utah agreed to subsidize a certain number of STD tests [Plaintiff] submitted to the Utah Public Health Laboratory." *Id.* All of the contracts are federally funded, where Utah acts as the intermediary to pass the funds through to Plaintiff.

Under the express terms of the contracts, the Department may terminate them at will upon thirty-days notice. Moreover, the Department has no obligation to renew a contract that is set to expire. Following the release of the videos, Governor Herbert directed the Department to exercise those options. Consequently, on September 8, 2015, the Department notified Plaintiff

3

that it was terminating the Utah Abstinence Education Program and the STD Surveillance Network contract effective October 8, 2015. It further informed Plaintiff it would not renew the Personal Responsibility Education Program that was set to expire on September 30, 2015. Finally, it informed Plaintiff the letter of understanding regarding STD testing would only continue through December 31, 2015.

The notices of termination had been anticipated since Governor Herbert issued the following press statement on August 14, 2015:

> The allegations against Planned Parenthood are deeply troubling. Current Utah state law prohibits the use of state funds to provide abortions by Planned Parenthood or any other organization. The federal government has provided grants to Planned Parenthood, distributed through the Utah Department of Health. These funds are also prohibited from being used to perform abortions. In light of ongoing concerns about the organization, I have instructed state agencies to cease acting as an intermediary for pass-through federal funds to Planned Parenthood
>
> Other state and local agencies and nonprofits will continue to provide STD education and prevention programs.

Press Release (Aug. 14, 2015) (Dkt. No. 3-1 at p. 28).

In addition to the press release, on August 17, 2015, the Salt Lake Tribune reported the Governor as stating, "[w]e now have a video where they're selling fetus body parts for money and it's an outrage and the people of Utah are outraged. I'm outraged. So for coloring outside the lines, Planned Parenthood forfeits some of their benefits." Robert Gehrke, *Utah Guv Says Cutting Fund to Planned Parenthood Won't Hurt Pregnancy, STD services*, The Salt Lake Tribune (Aug. 17, 2015) (Dkt. No. 3-1 at p. 33). It is further reported that Governor Herbert said, "[e]ven though it may not have happened in Utah, it happened in their organization. . . . If the federal government wants to fund Planned Parenthood, fund them directly. We don't have to be in the middle of that issue." *Id.*

4

(alteration omitted).  Finally, he reportedly said, "I'm just saying we're not going to be a party to this behavior.  You colored outside the lines.  You're going to be held accountable.  Work that situation out and maybe we'll talk again in the future."  *Id.* at 34.

Two days later, Governor Herbert "joined Planned Parenthood protestors who gathered at the state Capitol."  Daphne Chen, *Gov. Gary Herbert, Rep. Mia Love Join Planned Parenthood Protest at Capitol*, Deseret News (Aug. 19, 2015) (Dkt. No. 3-1 at p. 36).  At the protest, Deseret News reported the Governor as saying, "I'm here today to add my voice to yours and speak out on the sanctity of life."  *Id.*

Plaintiff asserts Governor Herbert's statements and participation in the anti-abortion protest show he terminated the contracts at issue because he opposes abortion and for no other reason.  Because abortion and the right of association are both constitutionally protected, Plaintiff asserts the Governor violated Plaintiff's constitutional rights when he ordered the contracts to be terminated.

## ANALYSIS

### I.   STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted).  The court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Id.* (quotations and citation omitted). To obtain a preliminary injunction, Plaintiff "must establish the following elements:  (1) a substantial likelihood of success on the merits; (2) irreparable injury will result if the injunction does not issue; (3) the threatened injury to the movant outweighs

any damage the injunction may cause the opposing party; and (4) issuance of the injunction would not be adverse to the public interest." *N. Natural Gas Co. v. L.D. Drilling, Inc*., 697 F.3d 1259, 1266 (10th Cir. 2012) (quotations and citation omitted). The Tenth Circuit has stated "where the three latter harm factors weigh in favor of the movant," the first factor is "relaxed." *Flood v. ClearOne Commc'ns, Inc.*, 618 F.3d 1110, 1117 n.1 (10th Cir. 2010) (citation omitted).[2]

## II.  EQUAL PROTECTION—CLASS OF ONE

Plaintiff asserts the defendants violated the Fourteenth Amendment's Equal Protection clause because they singled out Plaintiff for unfavorable treatment without cause.  The court addresses this claim under a "class of one" analysis.

### A.  Scope of Class-of-One Claims

In *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000), the Supreme Court recognized a class-of-one theory under the Equal Protection Clause.  In that case, a municipality demanded that a property owner grant it a 33-foot easement before providing water service even though it only demanded a 15-foot easement from other property owners.  *Id.* at 563.  Although the property owner was not a member of any protected class, the Supreme Court concluded the demand was irrational and arbitrary and improperly singled out the property owner.  *Id.* at 565.  Thus, it allowed the property owner's equal protection claim to proceed.

---

[2]  The defendants acknowledge this is the standard in the Tenth Circuit, but they have preserved an objection on the ground that the relaxed standard is contrary to Supreme Court precedent. Mem. in Opp'n, at 1 n.4 (Dkt. No. 19) (citing *Winter*, 555 U.S. at 20-22).

Following *Olech*, courts grappled with how to apply the class-of-one theory. The Tenth Circuit stated the class-of-one theory applies when "a public official inflicts a cost or burden on one person without imposing it on those who are similarly situated in material respects, and does so without any conceivable basis other than a wholly illegitimate motive." *Jicarilla Apache Nation v. Rio Arriba County*, 440 F.3d 1202, 1209 (10th Cir. 2006) (citation omitted). It cautioned, however, the theory should not be applied too broadly or it could transform federal courts into "second-guessers of the reasonableness of broad areas of state and local decisionmaking." *Id.* (quotations and citation omitted).

Approximately two years after *Jicarilla Apache Nation*, the Supreme Court narrowed the theory by concluding it did not apply in the public employee context even if the employer singled out the employee for "good reason, bad reason, or no reason at all." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 606 (2008) (quotations and citations omitted). The Court distinguished *Olech* on the basis that it involved "a clear standard against which departures, even for a single plaintiff, could be readily assessed." *Id.* at 602. In contrast, employment decisions "involve discretionary decisionmaking based on a vast array of subjective, individualized assessments." *Id.* at 603. It is common to find different treatment when the government is acting in its role as an employer rather than as sovereign over "citizens at large." *Id.* at 599, 605. And it is not the court's role to interfere in such discretionary functions unless the action taken by the government "independently violate[d] the Constitution." *Id.* at 606 (citations omitted).

In this case, the defendants contend *Engquist*'s holding should be extended to government contractors and not just public employees. As in *Engquist*, when the

7

defendants sought to terminate the contracts, it was not acting in its role as a sovereign, nor as a regulator. Instead, it was acting as a decisionmaker, making subjective, individualized assessments about whether to continue the contracts. Moreover, the terms of the contracts gave the defendants full discretion and authority to continue them or terminate them at will. In that arena, the defendants have broad discretion in how they manage their affairs and with whom they choose to contract.

The defendants' position has support in case law. Both the First Circuit and the Eleventh Circuit have extended the holding in *Engquist* to government contractors. *See Caesars Mass. Mgmt. Co. v. Crosby*, 778 F.3d 327, 336 (1st Cir. 2015); *Douglas Asphalt Co. v. Qore, Inc.*, 541 F.3d 1269, 1274 (11th Cir. 2008). In contrast, the Second and Seventh Circuits have refused to hold *Engquist* bars all class-of-one claims by government contractors, but even those circuits acknowledge *Engquist* may reach to some government contractors. *See Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 142 (2d Cir. 2010); *Hanes v. Zurick*, 578 F.3d 491, 495-46 (7th Cir. 2009).

In the Tenth Circuit, the issue remains open because the Court has not had to reach it. Nevertheless, it has stated in *dicta* that "it is arguably just a small step from" *Engquist* "to the conclusion the [class-of-one] doctrine shouldn't apply when the government interacts with independent contractors—in both circumstances, the government acts in a more proprietorial and less regulatory capacity." *SECSYS, LLC v. Vigil*, 666 F.3d 678, 690 (10th Cir. 2012) (citations omitted).

Plaintiff contends the court should not extend *Engquist* to this case. In support of its contention, Plaintiff cites to *Planned Parenthood of Central North Carolina v. Cansler*,

877 F. Supp. 2d 310, 325-27 (M.D.N.C. 2012) and *Planned Parenthood Greater Memphis Region v. Dreyzehner*, 853 F. Supp. 2d 724, 736-38 (M.D. Tenn. 2012). Both cases were decided after *Engquist* and both concluded it was improper to terminate funding to Planned Parenthood based, in part, on the class-of-one theory. Notably, however, neither case discussed *Engquist*. Therefore, the court does not find their reasoning persuasive.

While there may be some situations where *Engquist* should not apply to a government contractor (meaning the court is not adopting a *per se* rule), this is not one of them. There is no "clear standard" against which a departure could be measured. Thus, the court concludes the class-of-one theory is inapplicable in this case unless Plaintiff can show violation of an independent constitutional right.

Plaintiff argues that the independent constitutional right violated here is the right of association. Plaintiff asserts the videos portray false information and no investigation has uncovered any wrongdoing. Thus, by implication, Plaintiff contends its right to associate with other Planned Parenthood entities must continue because no criminal conduct has been proven. Termination of the contracts, however, does not interfere with Plaintiff's right to associate with other Planned Parenthood entities. It is free to continue its affiliation with Planned Parenthood and it has no legal right, let alone a constitutional right, to continue with the contracts. Moreover, Plaintiff has provided no case law to support its position that a contract cannot be terminated when a party associates with entities allegedly engaged in illegal conduct. Accordingly, the court finds no violation of the right of association.

Plaintiff further contends its right to advocate for and perform abortions has been violated. No federal or state funds may be used to perform abortions. Consequently, none of the contracts at issue pertain to abortions. The court therefore concludes termination of the contracts does not violate Plaintiff's right to advocate for or perform abortions.

Because Plaintiff has not shown an independent violation of a constitutional right, the court concludes Plaintiff is unlikely to prevail on its class-of-one claim.

### B. Appropriate Comparators

Even if *Engquist* does not apply, it is still unlikely that Plaintiff would prevail on its class-of-one theory. To establish a class of one, Plaintiff must show (1) it was treated differently than others who were "similarly situated in every material respect;" and (2) the "difference in treatment" was "wholly unrelated to any legitimate state activity." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1216 (10th Cir. 2011) (quotations and citations omitted). This is an objective standard of reasonableness. *Id.* The Tenth Circuit has stated, however, plaintiffs have a "substantial burden" to prove another is "similarly situated in all material respects." *Id.* at 1217 (quotations and citation omitted). The Court strictly reads the "element because it addresses the main concern with the class-of-one theory—that it will create a flood of claims in that area of government action where discretion is high and variation is common." *Id.* at 1218.

Plaintiff asserts others "similarly situated" should be defined as "other reproductive health care providers." The standard, however, requires similarity in every material respect and Plaintiff's suggested comparators do not adhere strictly to that element. At issue here is Plaintiff's association with entities who have allegedly engaged

in illegal conduct. While the allegations may prove to be unfounded, they are nevertheless material at this time. Plaintiff has failed to show it was treated differently from a specifically identified comparator, namely, another reproductive health care provider that associates with an entity allegedly engaged in illegal conduct. Accordingly, the court concludes Plaintiff is unlikely to prevail in showing it was treated differently than others similarly situated.

## III.   UNCONSTITUTIONAL CONDITION

Plaintiff also asserts two unconstitutional condition claims. First, Plaintiff asserts the defendants have penalized it for advocating for reproductive choice and associating with others who similarly advocate for pro-choice. Plaintiff contends this violates its First Amendment rights of speech and association. Second, Plaintiff asserts that its abortion services are constitutionally protected because without such services a woman could not exercise her right to have an abortion under the Fourteenth Amendment's Due Process Clause. By terminating the contracts, Plaintiff contends the defendants have penalized it for exercising its right to perform abortions.

"'Under the modern unconstitutional conditions doctrine, the government may not deny a benefit to a person on the basis that infringes his constitutionally protected [rights] even if he has no entitlement to that benefit.'" *Planned Parenthood of Kan. & Mid-Mo. v. Moser*, 747 F.3d 814, 838 (10th Cir. 2014) (quoting *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996)) (alterations omitted). The "doctrine has been applied when a condition acts retrospectively in a *discretionary* executive action," such as terminating a government contract, "in retaliation for prior protected speech or association." *Id.* at 839

(citing *Umbehr*, 518 U.S. at 671) (emphasis in original). Stated differently, the doctrine does not preclude officials from taking discretionary actions; it precludes officials from taking discretionary actions "in retaliation for the exercise of a constitutional right." *Id.* Retaliatory conduct is impermissible because it "would allow the government to produce a result which it could not command directly." *Id.* at 838 (quotations and citation omitted).

These types of "cases necessarily examine the official's motive for taking the action." *Id.* at 839 (citation omitted). Plaintiff bears the burden of proving "retaliation against the protected conduct was 'a substantial or motivating factor' for taking the action and the [defendants] would not 'have taken the same action in the absence of the protected conduct.'" *Id.* (quoting *Umbehr*, 518 U.S. at 675) (alteration omitted). The key phrase is "retaliation against *the protected conduct*" because retaliation against non-protected conduct falls outside the unconstitutional conditions doctrine.

Plaintiff contends that Governor Herbert's opposition to abortions and Plaintiff's association with other pro-choice entities was the substantial or motivating force behind his directive to terminate the contracts. It points to the Governor's participation in an anti-abortion protest mere days after his press release, during which he said he was there to speak out for the sanctity of life. These facts fall short of proving, however, that Governor Herbert's opposition to abortion was a substantial or motivating factor for terminating the contracts.

Gary Herbert has been the Governor of Utah for the past six years. Although Plaintiff has been associated with other pro-choice entities since Governor Herbert took office and it started performing abortions in Utah in 2011, the Governor still allowed the

Department to enter into and maintain contracts with Plaintiff. It was not until the videos were released that the Governor acted to terminate the contracts. Indeed, Plaintiff alleges and the defendants do not dispute that the Governor said, "We now have video where they're selling fetus body parts for money and it's an outrage and the people of Utah are outraged. I'm outraged. So for coloring outside the lines, [Plaintiff] forfeits some of [its] benefits." Complaint, ¶ 14 (Dkt. No. 2). Both the Governor's words and the temporal proximity between the release of the videos and his directive to terminate the contracts support he did not retaliate against Plaintiff based upon its right of association nor its right to advocate for and perform abortions. Therefore, the court concludes Plaintiff is unlikely to prevail on its unconstitutional condition claims.

## IV.    IRREPARABLE HARM

Plaintiff asserts it will suffer irreparable harm unless an injunction issues because it will be deprived of its constitutional rights. As discussed above, however, the court has concluded that Plaintiff likely will not be able to show it suffered a constitutional harm. Any financial harm Plaintiff has suffered from the contracts' termination can be redressed.

Plaintiff further asserts it will suffer irreparable reputational harm if an injunction does not issue. The defendants have shown, however, that many people have spoken out in favor of Planned Parenthood following the Governor's pronouncement. *See* Declaration of Austin Cox (Dkt. No. 19-2). While protestors against Planned Parenthood have rallied, so too have supporters of Planned Parenthood. The court therefore concludes that Plaintiff has failed to show it will suffer irreparable reputational harm. This factor therefore weighs in favor of the defendants.

**V.     INJURY TO PLAINTIFF COMPARED TO INJURY TO THE DEFENDANTS**

Plaintiff asserts that the injury it will suffer outweighs any damage the defendants will suffer if an injunction issues. In reviewing the defendants' action, it is also important to note what they did not do. The defendants did not terminate Plaintiff as a Medicaid provider. This means Plaintiff may still be compensated for providing care to Medicaid recipients. Additionally, the defendants have not sought to preclude Plaintiff from receiving funding directly from the federal government, as Plaintiff has done in the past. *See* Galloway Decl., ¶ 55 (Dkt. No. 3-1). Finally, the Governor's directive does not preclude Plaintiff from advocating for or performing abortions. Plaintiff's injury is related only to the loss of four contracts.

In contrast, if the defendants are enjoined from terminating the contracts, their authority to manage their affairs will be curtailed. Moreover, it will deprive the defendants of their contractual right to terminate the contracts at will. Finally, governmental entities have an interest in avoiding the appearance of corruption. Although Plaintiff has engaged in no wrong-doing, it is currently affiliated with other Planned Parenthood entities that have allegedly engaged in illegal conduct.

Under such circumstances, continuing to allow Plaintiff to provide services under the auspices of the contracts may reasonably be perceived by the citizenry of Utah as approbation of the wrongful conduct. Plaintiff derives benefit from its affiliation with the national organization. Indeed, Plaintiff argues that termination of the contracts harms its ability to raise funding from donors. The "good will" that inheres in the Planned Parenthood brand also extends to "bad will" that attaches because of the allegations of

14

wrongful conduct. The defendants have discretion under the contracts to consider whether continuation of them would send a message that wrongful conduct is acceptable. Requiring the defendants to continue the contracts will remove the defendants' discretionary decisionmaking. There is no monetary remedy for such injuries. The court therefore concludes the injuries to the defendants outweigh the injuries to Plaintiff.

## VI.   IMPACT ON THE PUBLIC INTEREST

The final factor to consider is whether an injunction is in the public interest. After the Governor issued his directive, individuals at the Department sought to dissuade him from terminating the contracts. They asserted that other providers could not fulfill the contracts as well as Plaintiff and that terminating its relationship with Plaintiff could jeopardize future funding from the federal government. The Governor reiterated he intended to redirect the funding to other qualified providers, but it is not clear he will be able to do so. Thus, some members of the public may be harmed if the contracts terminate.

Balanced against this harm is the right of the elected Governor of this State to make decisions about what is in the best interest of the State. These contracts relate to discretionary programs. The State has acted as an intermediary to pass through federal funds to Plaintiff, and has concluded it no longer desires to do so. It is contrary to the public's interest to remove from the Governor the very discretion his position entails. Indeed, these are the types of decisions that should be left to elected officials and not managed by the courts. The court therefore concludes it is not in the public interest to enjoin the defendants from terminating the contracts at issue.

## **CONCLUSION**

For the reasons stated above, the court DENIES Plaintiff's motion for a preliminary injunction (Dkt. No. 3) and VACATES the court's temporary restraining order (Dkt. No. 12).

DATED this 22nd day of December, 2015.

BY THE COURT:

_____
Clark Waddoups
United States District Court